***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission affirms with minor modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties through the Pre-trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The employer-employee relationship existed between defendant-employer and plaintiff at all relevant times herein.
3. Liberty Mutual Insurance Company provided defendant-employer with workers' compensation coverage at all relevant times herein.
4. Plaintiff's wages were sufficient to generate the maximum compensation rate for 2001 of $620.00 per week.
5. Plaintiff received sickness and accident benefits pursuant to a fully employer funded plan for 31 weeks in the amount of $300.74 per week for a total of $9,322.94, for the period from 23 April 2001 through 25 November 2001.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was born on 1 July 1955, and was 46 years old as of the date of the hearing before the Deputy Commissioner. He completed high school, and began working for defendant-employer on 7 September 1976.
2. On 6 April 2001, plaintiff was working his regular job as a stage 1 tire builder, which involved building the carcass of the tire. Plaintiff was changing a drum which had been hooked to a hoist. When plaintiff pulled on the lever to activate the hoist and lift the drum, he experienced a sharp pain at or about his waist and a little lower and a "tingling numbness" in his legs and feet.
3. Plaintiff reported this incident to his supervisor, Harold Brock, who filled out an accident report and sent plaintiff to the dispensary. Plaintiff complained of low back pain, and was given two Tylenols that morning and two ibuprofen and heat that afternoon. On the following morning plaintiff again reported to the dispensary due to continuing back pain with numbness bilaterally from his knees down to both feet. He was given a heat cream for his back and two ibuprofen and sent to Primary Care Plus for treatment.
4. Plaintiff presented to Primary Care Plus on 7 April 2001. He gave a history of a back injury while at work on 6 April 2001. Plaintiff was diagnosed with a "low back/SI strain with no evidence of disc disease at present." Plaintiff was given a prescription for pain and released to return to light duty for the next three days, with restrictions of no lifting more that 20 pounds, from floor to waist or from waist to shoulder.
5. On 12 April 2001, plaintiff presented to Doctor's Urgent Care Center with complaints of numbness from the waist down. Plaintiff had scheduled an appointment with a neurologist on 18 April 2001, and was seeking an out-of-work note until that time.
6. On 18 April 2001, plaintiff was involved in an automobile accident while enroute to the neurologist. He sustained injuries to his back and neck. Plaintiff presented to the emergency room of Cumberland County Hospital and was diagnosed with thoracic, lumbar and cervical spine strain. He was treated with medication and discharged home. He was also written out of work for two days and given light duty for an additional five days.
7. On 23 April 2001, plaintiff presented to Dr. Rangas Ramachandran, a neurologist at Health South, with complaints of low back pain, neck pain, and aches and pains below the waist bilaterally. He was treated conservatively and instructed not to push, pull or lift weights over 15 pounds.
8. On 3 May 2001, plaintiff returned to Dr. Ramachandran with complaints of blurring vision and numbness in his legs. MRIs of plaintiff's lumbar and cervical spine and his brain were performed on 10 May 2001. The brain scan showed evidence of sinusitis and the lumbar scan revealed degenerative disc disease at T12-L1, L1-L2 and L2-L3, with loss of normal signal intensity to the intervertebral discs. The degenerative changes were most pronounced at L2-L3. The cervical scan showed a lack of disc space between C4-C5, which Dr. Ramachandran opined may be the result of a partial bony fusion between the C4 and C5 vertebra. At C5-C6 there was "advanced discogenic disease present with marked disc space narrowing and degenerative end plate bony osteophytosis." Dr. Ramachandran opined this may be the result of previous trauma.
9. On 22 June 2001, Dr. Ramachandran performed a nerve conduction velocity study which showed no abnormalities. Plaintiff continued to complain of numbness and tingling in his lower extremities up to his chest level. After examining the various test results, Dr. Ramachandran noted that he was not able to find any clinical reason for plaintiff's numbness and tingling.
10. On 18 May 2001, plaintiff was seen and treated by Dr. Robert Lee Allen, a neurosurgeon. Dr. Allen reviewed plaintiff's MRI scans and diagnosed plaintiff's condition as a kyphotic deformity. He indicated that this is a condition in which plaintiff had a "severe angulation of the spine with at least some partial fusion, an abnormal shape to some of the vertebral bodies the most common causes would be either post-traumatic or there would be some congenital causes." Dr. Allen opined that the condition had been developing for some years and could have been the result of a car accident plaintiff was involved in when he was 16 years old. However, Dr. Allen expressed some surprise at the degree of problems plaintiff was currently having, given that his chronic condition had been going on for so long without symptoms.
11. Dr. Allen opined that the accident at work could have been an exacerbating or aggravating factor in the onset of plaintiff's cervical myelopathy. He further opined that plaintiff's kyphotic deformity caused plaintiff to be more susceptible to injury after a specific traumatic incident. Dr. Allen opined that given the long-standing kyphotic deformity, any trauma such as the work-related injury or the car accident of 18 April 2001 could have been sufficient to create plaintiff's current symptoms. Dr. Allen was unable to apportion plaintiff's current condition between the automobile accident when plaintiff was 16, the work-related accident of 6 April 2001, and the auto accident on 18 April 2001.
12. Plaintiff's pre-existing condition of kyphotic deformity was materially aggravated and/or exacerbated by the work-related specific traumatic incident of 6 April 2001. Plaintiff's back condition was further materially aggravated and/or exacerbated by the automobile accident of 18 April 2001.
13. On 27 July 2001, Dr. Allen performed surgery removing the C4 and C5 verebral bodies and replacing them with a strut from C3 to C6. Plaintiff remained hospitalized for five days and was eventually released to return to work on 26 November 2001, and he returned to work at that time.
14. On the date of his deposition, 20 May 2002, Dr. Allen opined that plaintiff should be rated with a 20% permanent partial disability to his back and that he had reached maximum medical improvement.
15. Plaintiff's average weekly wage was sufficient to yield the maximum compensation rate in 2001 of $620.00 per week.
16. Plaintiff received sickness and accident benefits pursuant to a fully employer funded plan for 31 weeks in the amount of $300.74 per week for a total of $9,322.94, for the period from 23 April 2001 through 25 November 2001.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On 6 April 2001, plaintiff sustained an injury to his back as a direct result of a specific traumatic incident arising out of and in the course of employment with defendant-employer. N.C. Gen. Stat. § 97-2.
2. On 18 April 2001, plaintiff was in an automobile accident which materially aggravated and/or exacerbated his work-related injury and his pre-existing condition of kyphotic deformity. The aggravation of an injury is compensable if the primary injury arose out of and in the course of employment, and the subsequent aggravation of that injury is a direct and natural consequence that flows from the primary injury. Heatherly v.Montgomery Components, Inc., 71 N.C. App. 377, 379, 323 S.E.2d 29, 30
(1984). Unless the subsequent aggravation is the result of an independent intervening cause attributable to claimant's own intentional conduct, the subsequent aggravation of the primary injury is also compensable. Roperv. J.P. Stevens Co., 65 N.C. App. 69, 73, 308 S.E.2d 485, 488
(1983). In the instant case, the subsequent aggravation of plaintiff's condition was not due to an intervening cause attributable to plaintiff's own intentional conduct. Rather, it occurred while plaintiff was on his way to receive treatment for his compensable work-related injury of 6 April 2001; therefore, the aggravation of plaintiff's condition was a direct and natural result of plaintiff's compensable injury. N.C. Gen. Stat. § 97-25.
3. As a result of the injuries plaintiff sustained by accident while in the course and scope of employment with defendant-employer, plaintiff is entitled to reasonable and necessary medical care for such conditions so long as such care is reasonably necessary to effect a cure, give relief or lessen disability. N.C. Gen. Stat. § 97-25.
4. Plaintiff's average weekly wage was sufficient to yield the maximum compensation rate for 2001 of $620.00 per week. Plaintiff is entitled to weekly compensation in the amount of $620.00 from 23 April 2001 through 25 November 2001, a period of 31 weeks, due to his inability to earn wages as a result of his injuries by accident while in the scope and course of employment with defendant-employer. N.C. Gen. Stat. § 97-29.
5. "Where a claimant suffers an injury that results in temporary total disability followed by a specific disability compensable under N.C. Gen. Stat. § 97-31, compensation for the specific disability is payable in addition to that awarded for temporary total disability." Watkins v.Motor Lines, 279 N.C. 132, 181 S.E.2d 588 (1971); Loflin v. Loflin,13 N.C. App. 574, 186 S.E.2d 660 (1972). Accordingly, plaintiff is entitled to compensation in the weekly amount of $620.00 for 60 weeks for the 20% permanent partial disability rating to his back received 20 May 2002. N.C. Gen. Stat. § 97-31(23).
6. Defendants are entitled to a credit for sickness and accident benefits paid in the amount of $9,322.94. N.C. Gen. Stat. § 97-42.
 *********** AWARD
1. Subject to attorney's fees hereinafter approved, defendants shall pay plaintiff temporary total disability benefits at the rate of $620.00 per week beginning 23 April 2001, and continuing through 25 November 2001. These benefits have accrued and shall be paid in a lump sum.
2. Subject to attorney's fees hereinafter approved, defendants shall pay plaintiff permanent partial disability benefits at the rate of $620.00 per week for 60 weeks for the 20% permanent partial disability rating plaintiff has received to his back. These benefits have accrued and shall be paid in a lump sum.
3. Defendants shall receive a credit in the amount of $9,322.94 for sickness and accident benefits paid to plaintiff during the period of his disability.
4. Defendants shall pay for all medical expenses incurred or to be incurred by plaintiff as a result of the compensable injury when bills for same have been submitted to and approved by the Industrial Commission, for so long as such evaluations, treatments and examinations may reasonably be required to effect a cure, give relief and/or lessen plaintiff's period of disability.
5. A reasonable attorney's fee of 25% of the compensation awarded to plaintiff in Paragraphs 1 and 2 is approved for plaintiff's counsel. One fourth of the lump sums due to plaintiff shall be deducted and paid directly to his counsel.
6. Defendants shall pay the costs of this action.
This the ___ day of August, 2003.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
DISSENTING:
 S/____________ BUCK LATTIMORE CHAIRMAN